Republic Cotton Mills v. Commissioner.
Republic Cotton Mills v. Commissioner
Docket No. 302 P.T.
United States Tax Court
1947 Tax Ct. Memo LEXIS 228; 6 T.C.M. (CCH) 445; T.C.M. (RIA) 47116; April 28, 1947
J. Craig Peacock, Esq. and John W. Townsend, Esq., for the petitioner. L. C. Hooks, Esq. and Irene F. Scott, Esq., for the respondent. VAN FOSSAN Memorandum Opinion Sur Mandate VAN FOSSAN, Judge: This case is before us upon petitioner's motion *229 for decision on the mandate of the Circuit Court of Appeals, Fourth Circuit, 147 Fed. (2d) 278, certiorari denied, 325 U.S. 862, which Court reversed the decision of this Court ( TC Memo. Op. September 9, 1943, Docket No. 302 P.T. [2 TCM 753], holding that the combining of the margins ascertained with respect to goods processed in petitioner's Mills 1 and 2 and in Mill 3 in order to determine the margins applicable to the business as a whole for the purpose of determining whether the taxpayer bore the burden of the processing tax was "erroneous as a matter of law" and "entirely without justification"; that separate consideration should be given to this claim for refund upon the remand in the light of the rule laid down in the statute and applied in numerous decisions, that section 907(e) is as binding upon the Commissioner and the courts as section 907(a) and that all the evidence should be weighed and considered which is pertinent to the contention that the claimant bore the burden of a part of the tax which it paid; and that It will therefore become the duty of the Tax Court upon the remand to consider the claims of refund for taxes *230 on the goods produced in Mills 1 and 2 separately from claims for refund on goods produced in Mill 3. No additional evidence was adduced. Our findings previously made are amended as follows: [The Facts] Findings 21, 22, 27 and 44 are stricken and the following findings (21, 22, 27, 44 and 45) are made in lieu thereof: 21. After these uncertainties had, to a certain extent, been removed by the imposition of the tax and the determination of the rate, selling agents representing the various mills undertook to revise the tax-to-be-added clause then generally in effect. The Association of Cotton Textile Merchants of New York joined in making such a revision and under date of July 28, 1933 made its recommendation which was, in part, as follows: * * * that on new business, on and after August 1st, prices be quoted and sales made to include the cotton processing tax of.0420 a pound as part of the cost of raw material. This manner of application, consistently followed throughout the market, will simplify the handling of this problem. In making this recommendation the Committee has approved a new clause to be used on all quotations, contracts, orders, sales notes and other methods *231 of sales identification. The text is given below and its use will obviate the need for continuing the present tax and/or labor clauses which should be discontinue as of August 1st inasmuch as quotations will be based on existing conditions with reference to all manufacturing costs: Prices on any undelivered portion of this contract are subject to increase or decrease due to governmental action under the "Agricultural Adjustment Act" or the "National Industrial Recovery Act", or any further Federal legislation affecting the seller's costs, and deliveries may be modified to the extent necessitated by any such governmental action or legislation. Clauses of an import similar to that quoted immediately above were generally adopted by the entire industry. The recommended clause was immediately adopted by petitioner with respect to all of its mills and on contracts executed on and after August 1, 1933, the tax-to-be-added clause was discontinued and the recommended clause was stamped on its sales contracts. 22. Quotations for the standard constructions manufactured by petitioner for July 31, August 1 and 31, 1933, as published in the Journal of Commerce, New York, were as follows: *232 August 1, 1933,
August 31, 1933,
July 31, 1933
(on new flat or
(on new flat or
(Subject to tax-to-
so-called "tax
so-called "tax
be-added clause)
included" basis)
included" basis)
38 1/2inch 64 X 60 5.35 print cloth
6 3/4
7 1/2
6 1/2
39inch 80 X 80 4.00 print cloth
8 7/8-8 3/4
10
8 3/4
39inch 68 X 72 4.75 print cloth
7 5/8-7 3/4
8 1/2
7 1/2
36 1/2inch 80 X 60 5.00 carded cloth
7 3/4
8 3/8
7 1/4
37inch 100 X 60 4.10 carded broadcloth
8 3/4
10
8 3/4-8 7/8
In the particular division of the industry demand had already exhausted itself by August 1, and the sellers' market which had existed for several months had turned into a buyers' market. The increased quotations which had been instituted on August 1 dropped steadily and by August 31 the quotations on a flat or tax-included basis had dropped to, or even below, the level of the July 31 quotation subject to the tax-to-be-added clause. On August 1, 1933, offering quotations on each of the standard constructions made by Mills 1 and 2 were very generally increased by adding to the basic quotations at which its goods had been sold in July amounts varying from 3/4 cent to 1 1/4 cents, *233 according to the amount of tax estimated to have been incurred with respect to a finished yard of each particular construction. Although petitioner and its selling agent endeavored to effect sales at the new level of prices, there were no buyers at such prices. The volume of sales during August at any price was relatively small. The highest prices per yard stated in petitioner's July 1933 sales contracts are as follows: Date
Price
Yards
38 1/2inch 64 X 60 5.35 print cloth
July 12, 13
6 3/4
130,000
July 12
6 5/8
100,000
39inch 80 X 80 4.00 print cloth
July 13
8 3/4
150,000
July 13
8 5/8
100,000
39inch 68 X 72 4.75 print cloth
July 12
7 5/8
31,000
July 13, 14
7 3/4
120,000
36 1/2inch 80 X 60 5.00 carded cloth
July 10 (Seconds)
6 3/4
2,130
July 17 (Seconds)
7 1/2
2,226
37inch 100 X 60 4.10 carded broadcloth
July 15
8 3/4
150,000
Prices per yard in petitioner's sales contracts for August 1933, are as follows: Date
Price
Yards
38 1/2inch 64 X 60 (Sales of seconds omitted)
Aug. 30
6 3/4
100,000
Aug. 31
6 1/2 *
400,000
39inch 80 X 80 (Sales of seconds omitted)
Aug. 10
9 1/8
200,000
Aug. 10
9 1/8
150,000
39inch 68 X 72 (Sales of seconds omitted)
Aug. 4
8 7/16
140,000
Aug. 10
0796
100,000
Aug. 31
7 1/2 *
280,000
36 1/2inch 80 X 60 (Seconds)
Aug. 9
7 1/2
2,209
Aug. 15
7 3/4
360
Aug. 29
7 1/2
150,000
Aug. 30
7 3/8
7,500
37inch 100 X 60
None
Sept. 6
8 1/2
20,000
*234 27. During the tax period and the immediately succeeding four months, i.e., from August 1, 1933 to July 31, 1935, inclusive, no sale was made of any construction by Mills 1 and 2 at a price as high as the August 1, 1933 quotations, excepting a sale of 4,209 yards of 80 X 80 construction on February 26, 1934 at 10 cents a yard and a sale of 2,305 yards of 68 X 72 construction on September 26, 1933 at 8 1/2 cents a yard. However, during that period certain sales were made by petitioner at prices in excess of the July 31, 1933 quotations, viz.: 6 3/4 cents for 64 X 60; 8 3/4 cents for 80 X 80; 7 5/8 cents for 68 X 72; 7 3/4 cents for 80 X 60 and 8 3/4 cents for 100 X 60. The total amount received in each month of the tax period on such sales exceeds by the amount set forth in column 2 of the following table, the sum that would have been received if sales of similar constructions and equivalent yardage had been *235 made at the above July 31, 1933 quotations. In column 3 of this table is set forth the balance remaining out of the taxes paid each month for Mills 1 and 2, after deducting such excess as set forth in column 2: Inventory 8/1/33
$ 8,296.17
August, 1933
$ 3,030.38
16,882.49
September
2,898.16
15,322.79
October
784.71
17,168.49
November
724.49
17,999.82
December
942.05
12,683.97
January, 1934
7,140.71
12,209.14
February
6,004.00
11,070.28
March
1,564.06
17,992.44
April
2,211.61
15,200.25
May
21,498.58
June
549.47
12,659.53
July
1,050.94
14,244.83
August
7,912.05
8,004.23
September
30.45
October
501.04
19,439.38
November
274.58
19,002.20
December
1,432.95
15,112.87
January, 1935
943.39
18,427.93
February
487.87
16,652.41
March
369.15
17,863.51
$38,852.06
$307,731.31
44. Petitioner did not bear the burden of any part of the amount it paid as tax with respect to its processing of cotton in Mills 1 and 2. 45. Petitioner did not bear the burden of any part of the amount it paid as tax with respect to its processing of cotton in Mill 3. As to Mills 1 and 2, the statutory margin for the tax period was *236 5.05204 cents ($0.1749856 - $0.1244652) per pound greater than for the base period. This is "prima facie evidence that none of the burden of such amount was borne by the claimant but that it was shifted to others." Section 907(a), Revenue Act of 1936. [Opinion] On brief petitioner points to but one factor which it claims reduces the spread between the base period and tax period margins and the extent thereof, i.e., the increase in labor and manufacturing costs of Mills 1 and 2 in the tax period of 3.09322 cents. It concedes, however, that such factor did not wipe out completely the spread in margins and hence was insufficient in itself to rebut the statutory presumption. The petitioner argues that the presumption is only a prima facie one and that its force in favor of the respondent is, in effect, completely destroyed by findings 10-12 which bring out the difference in operating conditions in the base and tax periods. The presumption established in section 907(a) may be rebutted "by proof of the actual extent to which the claimant shifted to others the burden of the processing tax." Section 907(e). The proof presented must satisfy the trial court that the claimant bore *237 the burden of the amount paid as tax and that it "has not been relieved thereof nor reimbursed therefor nor shifted such burden directly or indirectly," (1) through inclusion of such tax paid in the price of the product (2) through reduction of the price paid for the raw material," or (3) in any manner whatsoever." Section 902(a) and (b). The statute "requires evidence of concrete facts." Caldwell Sugars, Inc., 2 T.C. 105, affirmed (CCA-5) 140 Fed. (2d) 772, certiorari denied 324 U.S. 851, rehearing denied, 324 U.S. 888. The burden of proof placed by statute upon the claimant seeking a refund of processing tax is an onerous one. Franklin Peanut Co. v. Commissioner, (CCA-4) 144 Fed. (2d) 979; Finck Cigar Co. v. Commissioner, (CCA-5) 134 Fed. (2d) 261, certiorari denied, 320 U.S. 736; Colonial Milling Co. v. Commissioner, (CCA-6) 132 Fed. (2d) 505, certiorari denied 318 U.S. 780. Where the presumption is against the claimant, he must show that the spread between the margins "was not owing to his shifting the tax." E. Regensburg & Sons v. Helvering, (CCA-2) 130 Fed. (2d) 507. *238 In Webre Steib Co., Ltd. v. Commissioner, 324 U.S. 164, it is stated that the presumption does not * * * cease to operate on introduction of evidence merely sufficient to support a finding that some of the tax was shifted. It must be evidence sufficient to support a finding that the entire tax was shifted. Short of that, the presumption is not eliminated but only diminished to the extent that the rebuttal evidence will support a contradictory finding. Evidence as to economic conditions influencing supply and demand and their effect upon the claimant's operation to overcome the statutory presumption is admissible. Arkwright Mills v. Commissioner (CCA-4) 127 Fed. (2d) 465. It is not sufficient merely to show the difference in economic conditions prevailing in the textile industry generally during the base period and the tax period. It is also necessary to show their effect, if any, and the extent thereof expressed in dollars and cents upon the spread in the margins. It is conceded by petitioner that the findings with respect to the general economic conditions "do not prove the exact amount of the burden borne or shifted" by it. It states that "it found *239 that comparison of prices was the best means of satisfying that additional segment of its burden of proof." The tax paid on cotton processed in Mills 1 and 2 was $346,583.37. The petitioner claims that it is entitled to a refund of $298,450.34. Petitioner concedes that it passed on the tax in the amount of $9,280.97, representing the tax separately billed and collected after August 1, 1933, on deliveries on sales made prior to that date, and also the amount of $38,852.06, as shown by its "comparison of price test." Its claim that it bore the tax to the extent of $298,450.34 is also based upon its "comparison of price test." The comparison of prices is contained in a schedule, Exhibit 52, prepared by petitioner, in which it listed all its sales contracts, about 720 in number, made from July 1, 1933, to July 31, 1935, inclusive, giving contract number, date, clauses pertaining to tax contained in contract, yards ordered, and price per yard. In column 7 of such schedule there was entered the excess of the price per yard over the July 31, 1933, market or quoted price multiplied by the number of yards delivered on the contract. The total of the amounts extended into column 7 is $38,852.06. *240 Such amount represents the excess amount received on 122 contracts made during the tax period over and above the prices quoted in the New York Journal of Commerce for July 31, 1933. In other words, the petitioner would have us hold that it passed on the tax only to the extent that the contract prices during the tax period exceeded the quoted prices of July 31, 1933. The July 31, 1933, quoted prices, the prices used by petitioner in its Exhibit 52, and petitioner's highest July 1933 contract prices, were as follows: July 1933
highest
Prices
contract
July 31, 1933
Used in
prices of
Construction
Quoted Price
Exhibit 52
petitioner
64 X 60
6 3/4
6 3/4
6 3/4
80 X 80
8 7/8-8 3/4
8 3/4
8 3/4
68 X 72
7 5/8-7 3/4
7 5/8
7 3/4
80 X 60
7 3/4
7 3/4
7 1/2
100 X 60
8 3/4
8 3/4 A holding based upon Exhibit 52 would, in effect, guarantee to petitioner for the tax period practically the highest prices quoted or received in July 1933, or as far as the record shows during the entire pre-tax base period, irrespective of the fact that in July, 1933, and several preceding months, there was a sellers' market, whereas in the tax period *241 there was a buyers' market. In Byars v. Commissioner (CCA-5), 138 Fed. (2d) 513, it is stated: Section 902 of the Revenue Act of 1936 specified the conditions upon the allowance of refunds that must be met before a refund may be ordered. The Congress made clear its purpose that refunds should be allowed only to claimants who had paid, and had sustained the economic burden of, the tax. No attempt was made to insure processors against a net operating loss for the tax period, or to guarantee a reasonable return upon invested capital. * * * Neither does the statute guarantee to claimant an average manufacturing profit nor any particular price for its products. Hence, the fact that in only four months of the 20 months tax period was the monthly margin for Mills 1 and 2 sufficient to yield the petitioner the average manufacturing profit earned during the fourteen year period 1919-1932 (Finding 29) is not determinative. There is no showing that such average profits could have been earned under the unfavorable economic conditions prevailing during the tax period. Notwithstanding such unfavorable conditions, Mills 1 and 2 were operated at a profit. A comparison of high or *242 the highest prices in the base period with contract prices during the tax period is no more conclusive as to whether or not the claimant bore the burden of the tax than would be a comparison of the lowest prices in the base period with the contract prices in the tax period had the spread in the statutory margins been favorable to petitioner. Exhibit 52 fails of its purported purpose. Its application to the spread in margins has not been shown, nor does it appear to what extent, if any, the comparison of prices absorbed the spread. See Arkwright Mills v. Commissioner, supra, and E. Regensburg & Sons v. Helvering, supra.It ignores variations in costs during the base and tax periods as well as the differences in economic factors except as they influenced selling price in the tax period only. The petitioner, in effect, would have us substitute its comparison of price tests for the statutory margin computation. We find no authority in the statute for such a substitution. It is not shown that petitioner's contract prices were entirely governed by the quoted or market prices. The evidence is to the contrary. Under date of July 29, 1933, the president of petitioner *243 wrote to its selling agent for Mills 1 and 2, Cannon Mills, in part as follows: We previously advised you that we had the following goods that we would like to have disposed of: Construction
August
September
64/60
100,000 yds.
300,000 yds.
68/72
200,000 yds.
150,000 yds.
80/60
150,000 yds.
150,000 yds.
80/80
200,000 yds.
100/60
100,000 yds.
All of our July goods are taken care of and our August production, with the exception of the goods mentioned above. The September goods mentioned are in some cases more than half of our September production. I believe very strongly that goods should be sold. Even at this week's secondhand prices you can sell our goods and show 5 cents a pound profit. While on the shortened production we ought to do a little better than this, yet for the time being I am perfectly satisfied to sell goods at these prices. Of course, next week the processing tax must be added. I do not want to accumulate any goods and will feel very much more comfortable to have these September goods under order. If this quiet period continues another week or two, I feel quite sure that first-hands will be selling goods at prices secondhands *244 have gotten this week, plus of course the processing tax. I fully agree with you that it would be very poor policy to start out and offer our goods at lower prices; on the other hand, if you have firm bids to clean up sizeable quantities, I think by all means we should accept them. * * * The evidence shows that competition was very keen, that there was considerable bargaining or "haggling" as to prices between the buyers or their brokers and the selling agents. Petitioner itself set all prices since all sales were subject to confirmation by it. For three or four months prior to August 1, 1933, the effective date of the processing tax, all of petitioner's sales contracts contained the tax-to-be-added clause, i.e., a clause requiring the buyer to pay to the seller in addition to the contract price any taxes or charges imposed upon raw material by the Federal Government. With respect to deliveries made on such contracts after August 1, 1933, the petitioner added, as a separate item, to the invoices covering same, and collected, processing tax in the aggregate amount of $9,280.97. After the amount of the tax became known, the Association of Textile Merchants of New York recommended, *245 in order to eliminate the indeterminate prices under the tax-to-be-added clause, that on new business on and after August 1 "prices be quoted and sales be made to include the cotton processing tax of.0420 a pound as part of the cost of raw material" and for that purpose recommended the use of certain conversion factors to include the processing tax in the computation of cost and price to be quoted. By the adoption of the recommendation of the Association, it may reasonably be inferred that petitioner, in computing its costs, included the tax therein and set its selling prices accordingly. The evidence indicates that it did so and that every effort was made by petitioner to collect the processing tax. The fact that only a comparatively small number of petitioner's sales contracts carried the notation, "Price includes Processing Tax" or words to similar effect, is not controlling. That the processing tax was included in its prices was a reasonable inference arising from petitioner's adoption of the recommendation of the Association of Textile Merchants of New York to state a flat price including the tax, instead of stating the tax separately as it had done on deliveries made after *246 August 1, 1933, on contracts containing the tax-to-be-added clause. Moreover, petitioner, with respect to a number of deliveries on orders taken during the tax period, made adjustments after the tax was declared unconstitutional by reducing the contract prices so as to eliminate the tax therefrom. The inclusion of processing tax in manufacturing costs and the endeavor to recover such costs in the prices of products creates a fair inference that the tax was shifted. Louisville Provision Co. v. Commissioner, (CCA-6) 155 Fed. (2d) 505, rehearing denied May 28, 1946, certiorari denied 329 U.S. 788 (December 9, 1946); Colonial Milling Co. v. Commissioner, supra. In Webre Steib Co. v. Commissioner, supra, wherein the spread in margins was favorable to claimant (which it is not as to Mills 1 and 2), the Supreme Court stated that, where the Commissioner had proved that not only in a few cases but in a great number the tax was indicated in writing to be included in the sale price, "we think there is no doubt that he [the Commissioner] fully rebutted the presumption within the meaning of the statute." While it is argued that the base *247 period factors were sufficiently different to make the base period an inadequate standard, the petitioner has not submitted another period more comparable to the tax period. Its argument is primarily directed to the unfavorable economic factors prevailing during the tax period, i.e., overproduction and resultant buyers' market, which it claims prevented the passing on of any substantial part of the processing tax. The statutory base period covered 30 months from August 1, 1931 to July 31, 1933, and February 1, 1936 to July 31, 1936. It is true that the period from August 1, 1931 to the early part of 1933 was not a profitable one for the textile industry and operations were curtailed. However, in the early part of 1933, in anticipation of rising price levels, demand for products on the part of buyers greatly increased. The conditions then prevailing created a sellers' market which continued until August 1, 1933. The average gross sales value per pound processed for the period August to December, 1931, was 19.74031 cents, and the average margin was 10.38516 cents. For 1932, although the average gross sales value per pound processed was 18.51356 cents, since costs were less the margin *248 was somewhat higher, or 10.67412 cents, than in the 1931 period. For the period January to July, 1933, the average gross sales value per pound processed was 21.04967 cents and the average margin was 12.98926 cents. The average gross sales value per pound for the period February to July, 1936 was 27.86299 cents and the margin 14.15108 cents, both substantially higher than in the period preceding the imposition of the tax. Thus it would appear that in the 30-months base period there were at least 11 months in which conditions were favorable and in May, June and July, 1933, unusually so, the average margin for the month of July being 23.13955 cents a pound. On the other hand, during the entire tax period of 20 months, a buyers' market existed and costs of raw material and operation increased. Eliminating from the base period the last five months of 1931 and all of 1932, which constituted a part of the most unprofitable period in the recent history of the entire textile industry and which petitioner argues makes the base period nonrepresentative of normal business operations and not properly comparable to the tax period, the average margin for the remaining 13 months of the base period, *249 without taking into consideration hedging gains realized during the base period, is 13.47582 cents per pound. The average margin for the tax period, without consideration of the hedging gains realized in that period, is 17.40028 cents. Comparing the average margin for the tax period with the average margin for the 13 months of the base period above referred to, there is a differential of 3.92446 cents per pound, i.e., the average margin for the tax period is 3.92446 cents greater than the average margin for the 13 months of the base period. From the monthly margins, as stipulated, it appears that in each month of the tax period the margin was greater than the average margin for the 13 months of the statutory base period; January-July, 1933, and February-July, 1936. Notwithstanding the unfavorable economic conditions prevailing during the tax period, the average gross sales value per pound processed was 34.29596 cents per pound ($2,829,311.39 / 8,249,693). The average sales value per pound for the base period was 21.67494 cents ($2,474,685.65 / 11,417,265). Thus the sales value per pound in the tax period was 12.62102 cents greater than in the base period. Allowing for the increase *250 in costs in the tax period of 3.36785 cents and the tax paid of 4.20117 cents, there still remains a differential of 5.0520 cents unexplained. A rational inference is that the spread is due to the tax. The fact that petitioner did not receive during the tax period the July 31, 1933 prices plus the tax is not, under all the circumstances, determinative. United States v. Arkwright Mills, (CCA-4) 139 Fed. (2d) 454, upon which case petitioner relies, is distinguishable. In that case the tax was a floor tax imposed on July 31, 1933 inventories of finished goods on hand and goods in process of manufacture. A comparison was made between the July 31, 1933 quoted prices, and the sales prices obtained within a short period of time thereafter, of the very products on the cotton content of which the tax was imposed. In that case, as pointed out by the court, no evidence was presented as to whether or not there had been, during the tax period, powerful extrinsic factors at work which might, in themselves, account for the fall in the prices. Herein the petitioner itself adduced evidence to show that powerful extrinsic price-depressing factors were indicated in the latter part of *251 July and were very effective at the beginning and throughout the tax period. By August 1, 1933 the sellers' market, which had prevailed prior thereto, had turned into a buyers' market and there were no buyers at August 1, 1933 quoted flat prices. Buyers were over-supplied. Clearly, the downward trend of prices was due to the price-depressing factors. Although the petitioner's August 1933 contract prices were lower than the August 1, 1933 quoted prices, its contract prices were represented to include the tax. They represented the then current prices obtainable with tax included. There is no showing that any reduction in price during the tax period was due to the elimination of the tax therefrom. The only deduction of the tax from contract prices occurred after the tax was declared unconstitutional. From the deduction of the tax from contract prices it may reasonably be inferred that the tax was included therein at the outset. It is to be noted that herein there is no such variance in the pre-tax base period margin and the post-tax base period margin, compared with the tax period margin, as was present in Epstein v. Helvering, (CCA-4) 120 Fed. (2d) 427 cited by petitioner, *252 wherein a comparison of the pre-tax base period margin with the tax period margin indicated that the claimant had absorbed all the tax and a comparison of the post-tax base period margin with the tax period margin indicated that the entire burden of the tax was passed on to the consumer. Herein, the average pre-tax base period margin is 11.92860 cents and the post-tax base period is 14.15108 cents. Comparing the two with the average tax period margin of 17.49856 cents, the latter exceeds the pre-tax base period margin and the post-tax base period margin by 5.56996 cents and 3.34748 cents, respectively. The decrease in the latter is partly due to increase in costs, which were 1.11564 cents and 5.84576 cents higher than in the tax period and pre-tax base period. It is also to be noted that the average sales value of the pre-tax base period, which was 19.79475 cents per pound, increased in the tax period to 34.29596 cents per pound and decreased in the post-tax base period to 27.86299 cents, indicating an increase in sales value during the tax period and a decrease in sales value in the post-tax base period. Thus, in addition to the spread in margins unfavorable to the petitioner, there *253 is substantial evidence in support of the margin showing. See Henderson (Partnership) v. Commissioner, (CCA-5) 153 Fed. (2d) 442, certiorari denied, 329 U.S. 721 (October 14, 1946), rehearing denied, 329 U.S. 826 (November 12, 1946). After a careful consideration of all the evidence, we are not satisfied that the petitioner bore the burden of any part of the amount it paid as tax with respect to its processing of cotton in Mills 1 and 2, and we have so found. As to Mill 3, the statutory margin for the tax period was 7.09479 cents ($0.5443571 - $0.4734092) lower than for the base period. (Finding 18.) This is prima facie evidence that such amount was borne by the claimant and not shifted to others. The average cost per pound in the base period exceeded by 3.053517 cents the average cost per pound in the tax period (Finding 40), which reduces the spread by that amount, leaving a spread of 4.041273 cents in petitioner's favor, or a tax of $85,454.60 (2,114,547 units processed X 4.041273) presumptively borne by petitioner. The tax paid by petitioner was $88,810.97 (Finding 18). Petitioner concedes that it passed on the tax to the extent of $6,722.43, *254 which was separately billed and collected after August 1, 1933 on sales made prior to that date. It claims that it is entitled to a refund of $82,088.54. Since the spread in margins as to Mill 3 is favorable to petitioner, the burden is placed upon the Commissioner to rebut the statutory presumption flowing therefrom that the petitioner absorbed the tax to the extent of the spread. The evidence shows that petitioner, as it did in respect to Mills 1 and 2, adopted the recommendation of the Association of Cotton Textile Merchants of New York to include the cotton processing tax as part of the cost of raw material in quoting prices on any business on and after August 1, 1933. That it included the tax in the computation of its costs and prices is disclosed by correspondence between it and its selling agent. The selling agent, in a telegram dated August 2, 1933, requested a price on a certain construction and "also how much extra for processing tax," to which petitioner replied: "Quote * * * twelve and three-fourths * * * including three-eighths cents processing tax on cotton content." There is other correspondence to similar effect. In a sales contract dated October 4, 1934, the following *255 statement appears: Price of this contract includes Federal processing tax at the existing rate. If the tax be terminated lowered, or increased during the life of this contract an adjustment in price will be made on that portion undelivered at the effective date of change in the tax to compensate as accurately as can reasonably be determined for the decreased or increased cost due to the change in the tax. Other sales contracts bearing similar statements were introduced in evidence by the respondent. The respondent also adduced evidence to show that after the Agricultural Adjustment Act was declared unconstitutional petitioner made refunds of the processing tax to some of its vendees, including its own selling agent, and also eliminated such tax by reduction of tax-period contract prices on deliveries made after the tax was declared unconstitutional. Even if petitioner was compelled to agree to refund such tax in order to retain its customers, it did so primarily for the reason that it had sold its goods on a tax-included basis. Its agreements to reduce contract prices on deliveries after the tax was declared unconstitutional and its agreements to refund taxes paid were founded *256 on the fact that petitioner sold its goods on a tax-included basis. Mill 3 was operated at a profit during the four-months' period of August to and including November 1933, as well as in February, April and May of 1934, all in the tax period, notwithstanding the prevailing buyers' market. According to a computation made by petitioner and introduced by it in evidence, the statutory monthly margins for seven months of the tax period, August to November 1933, and February, April and May, 1934, were adequate to reimburse petitioner for all its necessary expenses of production and sale of cotton content articles, for processing taxes paid and in addition to provide a manufacturing profit to the extent of $52,996.68. (Finding 42.) The failure to make a profit during the tax period as a whole may have been due to other economic and/or operating difficulties with which petitioner had to contend with respect to Mill 3. In any event, the petitioner has not shown what the result of its operation of Mill 3 would have been had it not sold its products at prices including the tax. What has heretofore been said as to general economic conditions and their influence upon the operation of Mills *257 1 and 2, is equally applicable to Mill 3. That Mill 3 was operated at a small loss during the tax period is not determinative. It was operated at a loss for the six-year period 1930-1935 with the exception of 1933. As stated in Vennell v. United States, 36 Fed. Supp. 646, affirmed per curiam (CCA-3) 122 Fed. (2d) 936: "The fact of continued net losses can not operate to impair the effect of the evidence that the prices at which the goods were sold were set with a view to recover the tax paid." We stated in Wilson Milling Co., 1 T.C. 389, 393, affirmed (CCA-8) 138 Fed. (2d) 249, that the operation at a loss during the tax period "proves nothing with respect to shifting the tax burden. The loss may well have been that much greater had petitioner not passed on the tax to its customers." See also Putnam Knitting Co. v. United States, 58 Fed. Supp. 357. In Laurence M. Williams, Liquidator of Sterling Sugars, Inc. v. Commissioner, (CCA-5) 153 Fed. (2d) 547, certiorari denied, 329 U.S. 721 (October 14, 1946), the court found no error in the ruling of the Tax Court that even if the taxpayer had established *258 that it had sustained a loss it would not suffice as proof that taxpayer had borne the burden of the tax "because the petitioner might have sustained a loss notwithstanding the fact that it shifted the tax to its customers." With the exception of two standard constructions, practically all the production of Mill 3 was specially styled. During the tax period 50 different constructions in 500 or more styles were made. (Finding 7.) Prior to the manufacture of a new style, a cost card was prepared on which was calculated the established quantities and costs of raw materials as well as the probable labor and other costs entering into the production and sale of a yard of such new-style cloth. Although the sale prices were not actually fixed by such estimates of cost, such cost cards were designed primarily to enable the mill executives to quote prices in advance of manufacture and they were used as a guide by such executives to determine a price to quote or accept. (Finding 37.) The president of petitioner testified that since the processing tax was a new tax it was the "last element of cost in our cost computations," and that since the tax was a definite amount it was an element of cost *259 which could be more accurately determined than some other elements of cost. He further testified that as he did most of the selling he used the cost cards almost daily, "based upon the information supplied to me by those cost cards." On such cost cards certain cost factors, other than the tax, were underestimated whereas other factors, such as manufacturing expense and quantities and cost of materials, were ordinarily overstated in order to make certain that the cards would contain factors of safety. Whether the contract prices were more or less than the estimated costs, and if less, whether below the estimated costs minus the safety factors, the evidence fails to show. The products of Mill 3 being specially styled and not standard construction, no comparison of price test was submitted. Neither does the record show a comparison of quoted or contract prices with estimated costs. Since the tax was a fixed item, it may rationally be inferred that the quoted price and contract price included the tax. The respondent, having shown that the petitioner adopted the recommendation of the Association of Textile Merchants to include the tax as a part of the cost of cotton; that it billed the *260 tax as a separate item; that it indicated in writing that the contract price included the amount of the tax; that it contracted to refund a part of the contract price in the event of a decrease in the rate of the tax or a decision of its invalidity and actually did so; and that it changed its contract price after the decision of its invalidity by reducing it to eliminate the amount of the tax included therein, it "may be inferred that they represent the uniform practice of the claimant and the burden becomes his to prove that they do not." Webre Steib Co. v. Commissioner, supra. This the petitioner has failed to do. Hence, the respondent has fully rebutted the presumption within the meaning of the statute. Decision will be entered for the respondent. Footnotes
*. The sales contract covering the 400,000 yards of 64 X 60 construction and the sales contract covering the 280,000 yards of 68 X 72 construction contained, in addition to the up-and-down clause quoted in finding 21, a notation that the price included the processing tax.↩